409 So.2d 160 (1982)
KING MOTOR COMPANY and Liberty Mutual Insurance Company, Appellants,
v.
Herbert POLLACK, Appellee.
No. TT-372.
District Court of Appeal of Florida, First District.
January 28, 1982.
Rehearing Denied February 4, 1982.
*162 A.J. Beisler, III, of Anthony J. Beisler, P.A., Fort Lauderdale, for appellants.
Philip M. Warren of Sullivan, Ranaghan, Bailey & Gleason, P.A., Pompano Beach, for appellee.
MILLS, Judge.
In this appeal from a workers' compensation order appellants King Motor Company and Liberty Mutual Insurance Company (hereinafter referred to as King Motor) urge that the deputy commissioner erred in finding that the appellee/claimant Herbert Pollack (hereinafter referred to as Pollack) developed an occupational disease caused by exposure to motor vehicle fumes, in excluding a report of an environmental hygienist from evidence, and in awarding temporary total disability benefits from August 30, 1978, to December 4, 1978. Pollack cross-appeals, contending that the deputy erred in failing to find partial or total disability because of an occupational disease and in finding that Pollack's average weekly wage was $482.94. We affirm on all of the grounds raised by King Motor and reverse on the two issues raised by Pollack.
Since the deputy commissioner's findings of fact are supported by competent, substantial evidence, we adopt them and include them in this opinion:
That the Claimant, HERBERT POLLACK, was an employee of the KING MOTOR COMPANY, whose primary duties consisted of working as a service writer for motor vehicles in the repair division of KING MOTOR COMPANY.
That the Claimant, HERBERT POLLACK, had been employed as a service writer in essentially the same capacity for G.M. franchise dealerships for approximately 25 years and had worked for the Employer in that capacity for approximately seven (7) years.
That the Claimant's job required him to work in an area consisting of drive lanes where 35 to 50 cars, at any one time, would be idling, and that the nature of the Claimant's job required him to be exposed to exhaust fumes from these idling motor vehicles.
That the Claimant was a good employee, well-liked by his employer and with a substantial following of customers.
That the uncontroverted testimony presented and accepted by the Deputy Commissioners is that prior to January, 1975, the Claimant had no physical problem performing his job. That on or about January, 1978, the Claimant, while working for KING MOTOR COMPANY, began to develop a cough, red eyes and nausea. Dr. Paul Winick, a customer of KING MOTOR COMPANY, testified by deposition about these symptoms and this was further confirmed by the Claimant's supervisor at KING MOTOR COMPANY, Mr. John Paul, who testified in his deposition that over a period of the last several months that the Claimant worked on the job, that the Claimant began to cough and wheeze, and that it "progressively got worse until he eventually could hardly talk over his speaker," and that in addition to the coughing and wheezing and red eyes the Claimant "started to throw up" at the job.
The Claimant testified and it is accepted by the Deputy Commissioner that during the summer of 1978 he took a vacation and did not have any problems until he returned to work when he began to cough and throw up. This was again substantiated by his supervisor, Mr. John Paul, who testified that when the Claimant *163 "came back from vacation," he tried to make a go of it and ... he was throwing up real bad," and that, "I could hear (the Claimant) coughing and wheezing very bad over the speaker so bad, I would have to wait for him maybe a minute or two as he called the order in there."
That the Claimant, prior to leaving his employment on August 30, 1979, was treated by Dr. John J. Pittari and Dr. Ira Finegold.
Dr. Finegold, Board Certified in allergy and immunology, testified by deposition and at the hearing that he examined and treated the Claimant, and found that the Claimant was not able to continue to work at KING MOTOR COMPANY, at his old job after August 30, 1979, and the Claimant was temporarily totally disabled from August 30, 1979 to December 4, 1979. Dr. Finegold testified that he performed objective tests on the Claimant and determined that the Claimant had developed an allergic reaction to motor vehicle fumes resulting in a severe decrease in pulmonary function accompanied by clinical symptoms of coughing, nausea, shortness of breath and wheezing, and that said illness was directly related to and caused by exposure of the Claimant to said vehicle fumes at the Claimant's place of employment, and further, that said disease was caused by an exposure to fumes in excess of the exposure to the general public.
Dr. R.P. Busto, Board Eligible in allergy and immunology, examined and performed objective tests upon the Claimant. Dr. Busto testified by deposition and confirmed the findings of Dr. Finegold as to the cause and condition of the Claimant. I accept these findings and find that the Claimant developed an occupational disease caused by exposure to motor vehicle fumes at the Claimant's place of employment, KING MOTOR COMPANY, and that said exposure was in excess to that of the general public, both in amount and duration, and that the working conditions of KING MOTOR COMPANY, the Claimant's place of employment, created a greater hazard for said disease than that facing the general public, and that the Claimant was temporarily totally disabled from August 30, 1979 to December 4, 1979, which is the date of maximum medical improvement... .
That Dr. Finegold testified that the Claimant's condition is permanent, and Dr. Buston confirmed this in his testimony stating "we have (memory) cells that are sensitized and once they are sensitized they remain that way. This is a permanent condition." Both Dr. Finegold and Dr. Busto testified that the Claimant could not return to his former employment as a result of this condition, and limited the Claimant physically to an area of employment not involving "gas fumes." The Claimant testified that subsequent to being discharged by Dr. Finegold, he returned to an area similar to his past employment and related areas, and became violently ill. I accept this testimony and find the Claimant cannot return to his past employment or employment related to areas of motor vehicle industry which brings the Claimant in contact with motor vehicle exhaust fumes... .
That the Claimant is the sole support of his family and that because he has a young child who is seriously asthmatic his wife cannot work and help support the family, that he had a great need to continue in his former employment at the former wages he was making and with the insurance coverage that was provided at his former employment, and that the Claimant, when he was released by Dr. Finegold and was advised of his disability, sought new employment of the type that would not involve his exposure to motor vehicle exhaust fumes, that he has a high school diploma, is 49 years of age, was in the United States Air Force as an airman over 25 years ago, has worked at his trade for 25 years, has no other training or transferrable skills, and now finds himself in the unenviable position of trying to secure new employment, that he went to numerous private employment agencies and State agencies, including *164 the State Department of Vocational Rehabilitation in an attempt to secure work, that he answered ads in newspapers and placed applications for employment with every employer who would take an application. I find that the Claimant has made a valid search of the job market for employment within his limitations and that the only type of employment that the Claimant could secure because of his age and training is menial work paying an average weekly wage of $125.00 per week... .
King Motor challenges the deputy's finding that Pollack developed an occupational disease through four enumerations of error, the first of which is whether the opinions of Dr. Finegold and Dr. Busto were "competent, substantial and credible evidence within logic and reason and sufficient to support within reasonable medical probability the findings of occupational disease or accident by `exposure'?" Both doctors based their testimony and opinions on the history given and on the use of objective tests, namely, the pulmonary function test. The pulmonary function tests showed, according to Dr. Finegold, that Pollack was "seriously and adversely affected by gasoline fumes, exhaust and exhaust odors with demonstrable and significant decrease in his forced expiratory volume and forced vital capacity." (emphasis supplied). The fact that neither doctor accompanied Pollack when he went, at their direction, and exposed himself to the gasoline fumes and exhaust is of no moment. The doctors testified as to the directions given and Pollack gave detailed testimony regarding where he went, what the conditions were, and how long he remained. The deputy was authorized to and did accept this testimony.
The other three points raised by King Motors, unified and summarized, are was there competent, substantial evidence to support the finding of severe decrease in pulmonary function directly related to and caused by the exposure of claimant to motor vehicle fumes and were the criteria for finding occupational disease caused by exposure properly supported by the evidence?
Subsection 440.151(2), Florida Statutes (1977), provides:
Whenever used in this section the term `occupational disease' shall be construed to mean only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment, and to exclude all ordinary diseases of life to which the general public is exposed, unless the incidence of the disease is substantially higher in the particular trade, occupation, process, or employment than for the general public.
In order to recover under an occupational disease theory, the claimant must establish that (1) the disease was actually caused by employment conditions that are characteristic of and peculiar to a particular occupation; (2) it must actually have been contracted during employment in the particular occupation; (3) the occupation must present a particular hazard of the disease occurring so as to distinguish that occupation from usual occupations, or the incidence of the disease must be substantially higher in the occupation than in usual occupations; and (4) if the disease is an ordinary disease of life, the incidence of such a disease must be substantially higher in the particular occupation than in the general public. Broward Industrial Plating, Inc. v. Weiby, 394 So.2d 1117 (Fla. 1st DCA 1981).
We agree with the deputy's findings that there was sufficient showing of a causal relationship between the illness and the employment conditions and that the occupation presented a peculiar hazard of the disease occurring. Most workers are not required by their jobs to stand in an area where they are exposed to exhaust fumes of 35 to 50 idling motor vehicles. That the disease was actually contracted during Pollack's employment as a service writer for motor vehicles is uncontested. Finally, there was no evidence that an allergic reaction to motor vehicle fumes is an ordinary disease of life.
We reject King Motor's contention that Pollack was required to establish exactly *165 what chemicals or chemical component of motor vehicle fumes caused his condition. Lake v. Irwin Yacht & Marine Corp., 398 So.2d 902 (Fla. 1st DCA 1981).
We turn now to the question raised by Pollack on cross-appeal and that is whether the deputy commissioner erred in failing to find a partial or total disability because of occupational disease and a loss of wage earning capacity. In essence the deputy stated that Pollack had developed an occupational disease, the condition is permanent, and there was a loss of wage earning capacity; however, he further stated that since the doctors could not assign an anatomical percentage of disability, there was no anatomical permanent partial disability and, in line with Agrico Chemical Co. v. Laws, 384 So.2d 722 (Fla. 1st DCA 1980), he could not, therefore, enter an award based on loss of wage earning capacity.
Laws, supra, does hold that without a finding that the claimant has sustained a permanent anatomical impairment, there cannot be an award for loss of wage earning capacity. It does not hold, however, that a finding of a particular degree of permanent anatomical impairment must be made. In the instant case, both doctors testified that the condition was permanent and Dr. Busto's testimony that a person has memory cells that are sensitized permanently establishes (if believed, and the deputy expressly accepted the testimony) that the condition is a permanent anatomical impairment.
This case is distinguishable from that of Plantation Construction Co. v. Ayers, 385 So.2d 1138 (Fla. 1st DCA 1980). In both that case and this one the medical testimony established that once the claimant was no longer exposed to the harmful element (in that case, bacteria in the water, and in this one, motor vehicle exhaust fumes) the claimant suffered from no continuing medical problems, but in the instant case there was further medical testimony that the claimant had suffered a permanent sensitization of certain cells. A second distinction is that Ayers involved a finding of 10% permanent partial disability of the body as a whole under circumstances where there was no medical testimony that the claimant had a permanent disability related to the condition at issue and there was an explicit finding that there was no loss of wage earning capacity. In the instant case, there was medical testimony regarding a permanent anatomical impairment (but no percentage rating) and there was a specific finding that there was a loss of wage earning capacity.
One final consideration in reviewing an award based on occupational disease is that Section 440.151(3), Florida Statutes (1977), defines "disablement" as "the event of an employee's becoming actually incapacitated, partially or totally, because of an occupational disease, from performing his work in the last occupation in which injuriously exposed to the hazards of such disease... ." (emphasis supplied). Thus, as stated in American Beryllium Co. v. Stringer, 392 So.2d 1294 (Fla. 1981), "[I]t is the disability and not the disease which determines the compensability of the claim." That the inability to continue in a particular occupation was a proper factor to consider in an occupational disease claim was explicitly recognized in Ayers at 385 So.2d 1140.
The evidence in this case clearly establishes that Pollack has been actually incapacitated from performing his work as a service writer, the last occupation in which he was injuriously exposed. Applying the law to the facts before us, it is clear that Pollack has established a compensable claim based on loss of wage earning capacity.
During the course of the hearing King Motor called one Raymond Stone to testify concerning air quality. Stone holds a certificate of safety professional. He testified that he took air samples at King Motor Company and at another center, for purposes of comparison, and sent the air samples to a laboratory in Illinois. Because Stone had no personal knowledge as to how or when the samples were received, who conducted the tests, or how the tests were conducted, the deputy commissioner excluded from evidence the report of those test results when they were offered into evidence *166 through Stone's testimony. We find no error in the deputy's evidentiary ruling. Auletta v. Fried, 388 So.2d 1067 (Fla. 4th DCA 1980).
King Motor asserts that the deputy commissioner's finding that Pollack was temporarily totally disabled from August 30 to December 4 was error. The record supports the deputy commissioner's finding that Dr. Finegold testified that Pollack was not able to continue his work at King Motor after August 30 and that he was temporarily totally disabled August 30 to December 4. Contrary to King Motor's assertion in the brief, there is evidence that Pollack received medical treatment during the period at issue. We find no error in the deputy commissioner's ruling on this point.
As for the issue on appeal regarding average weekly wage, the parties argued as to the applicability of the different methods of calculation set forth in Section 440.14, Florida Statutes (1977), as well as to factual details, such as the kind and value of certain fringe benefits. The order of the deputy commissioner is totally lacking in findings of ultimate fact on this point so as to make it impossible for us to review the basis of his determination. It states only the conclusion that "at the time Claimant was injured, his average weekly wage was $482.94 including fringe benefits... ." See Brown v. S.S. Kresge Company, Inc., 305 So.2d 191 (Fla. 1974); Hall v. Red Bishop Roofing, 393 So.2d 618 (Fla. 1st DCA 1981); Decker v. City of West Palm Beach, 379 So.2d 1004 (Fla. 1st DCA 1980). For that reason, we reverse on the issue of average weekly wage and remand for further proceedings.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
WENTWORTH, J., and OWEN, WILLIAM C., Associate Judge, concur.